# EXHIBIT A

David Otto & Affiliates, PC
David J. Otto, Esq.
2300 West Sahara Ave. Suite 800
Las Vegas, NV 89102
Phone: 702-419-1222
Fax: 702-778-3670
davidottolaw@yahoo.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| GORDON MARTINES an individual, | CASE NO.: 2:12-cv-01441-LDG-PAL |
| Plaintiff. | |
| v. | **VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a public entity; and SHERIFF DOUGLAS GILLESPIE, an individual; and SGT. JAMES MELTON, an individual; and, LT. CLINTON NICHOLS, an individual; and CAPTAIN PATRICK NEVILLE, an individual; and DEPUTY CHIEF JAMES OWENS, and individual; and LT. RAY STEIBER, DIRECTOR WALTER NORRIS, an individual; DIRECTOR JUDY BLEAK, an individual; ASSISTANT SHERIFF THEODORE MOODY, an individual, and UNDERSHERIFF JAMES DIXON, an individual; and DIRECTOR MICHAEL SYNDER, an individual; and DIRECTOR JEFFERY ROCH, an individual; | **PURSUANT TO 42 USC 1983 Deprivation of Constitutional Rights under Color of Law; Monell Claim 42 USC 1983; Conspiracy to Violate Civil Rights 42 USC 1985 (2)); Conspiracy to Violate Civil Rights 42 USC 1985 (3); Failure to Intervene 42 USC 1986: Discrimination and Retaliation under Title VII of the Civil Rights Act of 1964, 1991 amendments thereto and 42 USC §2000(e), et seq.. FOR DAMAGES, AND RELATED STATE LAW CLAIMS**<br><br>**[DEMAND FOR JURY TRIAL]** |
| Defendants. | |

COMES NOW Plaintiff Gordon Martines (hereinafter referred to as "Plaintiff" or "Detective Martines" or "Martines"), files this First Amended Complaint, by and through his attorneys David Otto & Affiliates, PC, David J. Otto, Attorney at Law, and hereby alleges and states

against Las Vegas Metropolitan Police Department and all individual (hereinafter referred to as "Defendant" or "Metro" or "LVMPD" "individual defendants' or by name) that the following allegations are true except for those matters alleged on information and belief Plaintiff believes them to be true as follows:

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1. While acting under color of law and by way of authority and power granted to them by the State of Nevada, Clark County and the Las Vegas Metropolitan Police Department, the Defendants, their agents, officers, servants and/or employees, engaged in unlawful conduct by, inter alia, retaliating against Plaintiff for exercising his First Amendment right to free speech and denying him procedural due process by such measures as: (a) creating a hostile work environment based on Plaintiff's age, and national origin or race; (b) engaging in reckless, negligent and intentionally damaging behavior, stigmatizing Plaintiff from his coworkers; (c) denying Plaintiff the right to take and be compensated financially in cash while employed at the Las Vegas Metropolitan Police Department while granting that right to other identically-situated employees; (d) fabricating internal affairs complaints against plaintiff; (e) re-assigning Plaintiff to known punishment details; (f) interfering with Plaintiff's work to the extent that it was nearly impossible for Plaintiff to complete his assignments; and (g) eventually actually discharging and – or constructively discharging Plaintiff's employment at the Las Vegas Metropolitan Police Department without providing the process due to Plaintiff under law.

2. The unlawful, harassing and retaliatory behavior on which this action is based commenced in or about November 7, 2010 but was based on Plaintiff's words and actions prior to that date. The unlawful, harassing and retaliatory behavior on which this action is based was constant, persistent, pervasive and continuing in nature, up until the date of filing of this Verified First Amended Complaint and continues to the present day.

3. On or around July 16, 2012, Plaintiff was constructively and – or actually terminated when Las Vegas Metropolitan Police Department abruptly and without hearing, without following the requirements of the Collective Bargaining Agreement, unlawfully stopped all of Plaintiff's salary pay and benefits deleted all of Plaintiff's accrued leave which was in excess of 2500 hours of leave. **ALL OF PLAINTIFF's PAY** and **ALL HIS BENEFITS** were **completely cut off without notice to him between July 16, 2012 and October 5, 2012.**

4. Plaintiff is a 62 year-old male who has been a sworn peace officer with the Las Vegas Metropolitan Police Department for 34 years, and has been a sworn police officer for a total of 38 years.

5. Prior to the events detailed herein beginning in or around November 2010, Plaintiff had always received favorable employment evaluations, nothing but praise from his colleagues and supervisors, and numerous citations and awards for his performance.

6. At all times relevant herein, Plaintiff was an individual residing in the State of Nevada.

7. At all times relevant herein, Defendant Las Vegas Metropolitan Police Department, was a Nevada law enforcement agency, now and was an "employer" of the Plaintiff within the definition of Title VII of the Civil Rights Act of 1964, 1991 amendments thereto and 42 USC §2000(e), *et seq.*.

8. All events giving rise to this suit occurred in Clark County, Nevada.

9. All the acts and/or failures to act alleged herein were duly performed by and/or are attributable to Defendants, acting by and through their agents and employees. Said acts and/or failures to act were within the scope of said agency and/or employment, and the Defendant ratified said acts and/or omissions.

10.     Plaintiff filed a charge of Discrimination with the Equal Employment Opportunity Commission, and a Right to Sue letter was issued on May 18, 2012, allowing Plaintiff to sue this Defendant.

11.     That this Court has jurisdiction based on subject matter jurisdiction over the pending causes of action pursuant to Title VII of the Civil Rights Act of 1964, the 1991 amendments thereto and 42 USC §2000(e)-2 and this Court also has jurisdiction over this cases pursuant to 42 USC §1983, 42 USC §1981, 42 USC §1988 the United States Constitution and other applicable federal law.

12. This Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as they are so related that they form part of the same case and controversy.

13.     That Plaintiff demands a jury trial of this case pursuant to Local rule 38-1 and 28 USC 1411.

14. Plaintiff began working for Metro on March 24, 1978. He started out as a patrolman and then went to the Special Weapons and Tactics (SWAT) team.  After the SWAT team, Plaintiff became a Motorcycle Patrol Officer. In or about 1986, while on motorcycle patrol duty Plaintiff was hit by drunk driver and was severely injured.  After his recovery from this on duty accident, Plaintiff became a detective in the accident investigation detail in 1987. After a few years as an accident investigator detective, Plaintiff again joined the motorcycle patrol detail and then re-entered the detective bureau in 1994.  Plaintiff has been a Metro Detective since 1994.

15. Plaintiff has been a detective for approximately 25 years and has worked as a Metro Police Officer for 34 years at Metro and has been in the law enforcement field for 38 years total.

16. Since Plaintiff began at Metro on March 24, 1978, with the last twenty five (25) years, as a detective, he as earned a sterling reputation and an exemplary service record.

17.  Plaintiff is Hispanic and is a resident of Clark County, State of Nevada.

18. At all relevant times, Plaintiff was over the age of 40.

19. On August 15, 2012 Plaintiff filed the original complaint in this case and was appearing Pro Per.  Plaintiff is now represented by Counsel for the filing of this First Amended Complaint.

20. On or about April 13, 2012, Plaintiff was awarded Workers Compensation by order dated April 13, 2012 and attached hereto as Exhibit A.

21. Between January and June of 2010, Plaintiff was running a political election campaign to be elected Sheriff of Clark County, Nevada a position which would put him at the head of the law enforcement agency known as the Las Vegas Metropolitan Police Department - Metro.

22. This was the third time Plaintiff had run for Sheriff of Clark County.

23. On or about and between January and June of 2010, Plaintiff filed ethics complaints with the Nevada Commission on Ethics against incumbent Sheriff Douglas Gillespie regarding election law violations.

24. The ethics complaints alleged that Sheriff Gillespie violated NRS 281 A.400(9): in that Gillespie attempted to benefit his personal or financial interest through influencing his subordinates.

25. The allegation in the ethics complaint was that Gillespie directed or required robbery and homicide detectives and sergeants to attend the May 2010 meetings and participate in the show COPS during their work hours.  The allegations stated that Gillespie got a personal benefit by "advertising himself" on the show COPS in which LVMPD employees were forced to take part and to use this situation and Sheriff's Gillespie's position, as a political vehicle for  Gillespie's re-election as Sheriff.

26. Plaintiff alleged that Gillespie ordered Langley Productions (COPS) and the entire robbery section (33 detectives) to assist, cooperate with and facilitate the production of real life criminal investigations for TV and use as a political vehicle to boost Sheriff Gillespie's campaign for re-election. Plaintiff was actually ordered by Lt. Nichols to be the liaison between the TV production crew and help facilitate the TV's production. Plaintiff refused to participate and informed Lt. Nichols of his intention to file an ethics complaint against Sheriff Gillespie. Plaintiff was immediately dismissed from that assignment.

27. Further, Plaintiff's May 2010 Ethics Complaint alleged that Langley Productions a California video production company contributed $45,000.00 in campaign contributions to Sheriff Gillespie as a 'quid pro quo' payment for allowing the use of Metro facilities for both filming live police investigations in the field and live bookings in the county jail, in its television show titled "COPS".

28. On or about 2002, Plaintiff began working on a "Cold" murder case. That murder had occurred in April of 1996 in or near Alamo, Nevada. (Hereinafter referred to as "the Cold Murder Case.")

29. Plaintiff believed that "cold" murder case involved a police officer or more than one police officer who may have been involved in identifying a confidential informant to a drug dealer. The murder investigation had thus far shown Detective Martines that the case involves members of the LVMPD Narcotics Section and the Federal DEA. One of the principle accessories to the murder is a man named Daniel Barker, who is currently housed in a Federal Prison in Florida. This prison placement was arranged for Daniel Barker by local Las Vegas FBI agents as a tradeoff, for information from Daniel Baker, regarding the murder of an LVMPD drug informant in April 1996 in Alamo, Nevada (hereinafter sometimes

referred to as "the Informant Murder Case " or the "Alamo Murder Case" or "the Alamo Murder Investigation").

30. On or about and between October 1, 2000 and January 2001 Plaintiff informed his superiors including Lieutenants John Alamshaw, Sgt. Al Cervantes and Captain Anthony Tom Lozich and also the entire Robbery Section Detectives, that he believed the case involved Metro Officers identifying a confidential informant in order for that confidential informant to be murdered.

31. Lieutenant John Alamshaw was in the Narcotics unit at the time the confidential informant was murdered. Plaintiff has reason to believe that Alamshaw was involved in identifying the confidential informant.

32. It was that confidential informant who Plaintiff has solid reason to believe was murdered and buried in the desert near Alamo, Nevada.

33. On or about and during July and August 2010 Plaintiff was told about evidence mishandling in a home invasion and sexual assault case involving subjects or defendants named: Leonard Hunt, Jovan Carter, Abdul Shakir, David Todd and possibly 2 to 8 other individuals. (Hereinafter this case will sometimes be referred to as the "Carter Case").

34. The Carter Case was a major Home Invasion Robbery/Sexual Assault investigation by Metro Sergeant Ike Ziros' squad. Metro Patrol Lieutenant Joseph O****'s family were reported as victims including their 11 year old daughter. (Due to the sensitive nature of this situation and the age of the victim Plaintiff 's Counsel has obscured Lieutenant O****'s identity.

35. One week after Plaintiff heard about the evidence mishandling in the Carter Case, Metro Sergeant James Melton ordered Plaintiff and his then partner Detective Luis Araujo into Melton's office when and where he explained in detail the mishandling of evidence,

break in chain of custody and repackaging of evidence by certain unknown persons who are or were sworn peace officers and employees of Defendant Metro, and by Detectives Teri Miller and Eric Honea. Sgt. James Melton explained the break in the chain of custody of that evidence, and then presented a false and fabricated written officer's report which was written by Detective Teri Miller.

36. Immediately after Sergeant Melton had explained what really happened and the actions of Detective Miller and Detective Honea, in that Detective Miller and her partner Detective Eric Honea on their own had entered Sergeant Steve Junge's locked office had illegally and in contravention of established evidence standards, removed and repackaged evidence on their own without assistance from the officers who had searched the five homes and recovered the property involved in the case. This removal and repackaging effectively tainted the evidence and could, in any subsequent evidentiary hearing call its validity into question.

37. This repackaged and impounded evidence was said to have eventually gone into the FBI's evidence vault, as the FBI and Justice Dept. was supposedly to eventually prosecute the case due to potential conflicts over Lt. O***'s family having allegedly been victimized by the suspects. And, there were gun crimes which would have given Federal investigators jurisdiction over the case.

38. At the time Sergeant Melton presented the Officer's report by Detective Miller in his office, Plaintiff and Detective Araujo read the report and found it to be a complete fabrication of what had actually happened and what had just been explained to them by Sgt. Melton. According to Sergeant Melton the fabricated evidence report was specifically understood and condoned by Metro's upper management including all of the named individual defendants.

39. Sergeant Melton then attempted to solicit approval and cooperation in the submission of this fraudulent and falsified report of the evidence from the Carter Case by and from Plaintiff and

Detective Araujo.  Sergeant Melton specifically requested that Detectives Martines and Araujo go along with the conspiracy cover-up and to keep silent about the removal of evidence and support the break in the chain of custody of the evidence by Detectives Miller and Honea in addition to the condoning and approval of and by supervisory personnel.

40. Detective Martines then and there advised Sergeant Melton to destroy this fabricated Officer's Report by Detective Miller and to take another path, start over and just tell the truth about what happened, as Detective Miller's and Metro's upper management sanctioned the false and fabricated officer's report would just be asking for trouble for everyone and implicated all involved in a criminal conspiracy to cover up the tainted evidence.

41. The Officer's report by Detective Miller contained false information.  This false information stated that Detective Miller had originally supervised the collection of the evidence and had personally impounded the evidence directly into the FBI's evidence vault.  The report did not mention the removal and repackaging of the evidence by Detectives other than the original evidence collecting officers, and also did not mention the storing of the evidence in Sgt. Steve Junge's locked office overnight, and Det. Miller and Det. Honea obtaining a key to that locked office from the maintenance man during the night time hours allegedly without any one else's permission or knowledge at the time.

42. Plaintiff – Detective Martines implored Sergeant Melton to destroy the falsified officer's report by Detective Miller and to tell only the truth about what really happened with the evidence in the Carter Case.

43. Detective Martines, Plaintiff then and there explained that it was not the end of the world and that this major original multi suspect and multi incident Robbery/Sexual Assault case could be salvaged and successfully prosecuted even without that specific chain of tainted evidence that was collected pursuant to the five search warrants.

44.  At that point in the conversation with Sergeant Melton, Detectives Martines and Araujo were immediately and angrily dismissed by Sergeant James Melton.

45. Later Plaintiff experienced an attitude of isolation, suspicion and contempt by the entire robbery section toward himself and Detective Araujo, and any further information or discussion was intentionally avoided regarding the case and was kept directly quiet by the entire robbery section.

46.  After Plaintiff's refusal to go along with the evidence mishandling cover up and conspiracy as proposed by Sergeant Melton, Melton initiated a campaign to isolate and contain Detective Martines and laid the foundation to ruin his reputation and career for his refusal to co-operate and support the criminal cover-up.

47.  Sergeant Melton began this smear campaign by conducting repeated one-on-one counseling sessions regarding non-existent problems with Detective Martines' assigned criminal case load and the number of cases depicted in his computer regarding the supposed reflection by continual auditing that the cases that were not disposed or closed rapidly enough.

48.  Sergeant Melton then also ordered that Detective Araujo be re-assigned to another Detective (Chris Hubbard) thereby separating Martines and Araujo as partners.  Plaintiff was ordered to work by himself and if needed could only request assistance thru Sgt. James Melton, from other Detectives in the squad.  Sgt. Melton also advised Plaintiff that since he had been a detective and police officer for so long that Plaintiff should just sit back and take an easy ride and just coast along now in working and doing his job.  Plantiff advised Melton immediately that he wanted to be treated like everybody else, no differently.  This upset and angered Sgt. Melton.

49. Sergeant Melton ordered that Plaintiff  Martines would now be functioning alone and independent without an assigned partner for an indefinite period of time.

50. On information and belief Plaintiff hereby alleges Sergeant Melton and supervisory staff up through the chain of command including Sheriff Douglas Gillespie were involved in this criminal conspiracy and cover up of tainted evidence against the numerous suspects in the Carter Case i.e. Leonard Hunt, Jovan Carter, Abdul Shakir, David Todd and possibly 5-8 others.

51. On information and belief Plaintiff hereby alleges that the later ramifications of this cover up could be immense and criminal, as everyone in the robbery section and numerous other police employees knew of what had happened with the now tainted evidence, and that the entire case was planned on eventually going to be transferred to the Justice Department for prosecution to avoid any conflict of interest because of the victimization of Lieutenant Joseph O****'s family. The case should have been transferred to the Justice Department but after this mishandling of evidence it would have to be done without their knowledge of the tainted evidence because if the United States Department of Justice knew of such mishandling they would in all likelihood have declined prosecution.

52. On or about October 10, 2011 some of the individuals involved in this case were convicted by a plea of guilty or no contest to certain charges.

53. These cases are filed under Eighth Judicial District Court for Clark County Nevada Case Numbers: 10C265556-1; 10C265556-3; 10C265556-4.

54. On or about August 20, 2010 there was a coroner's inquest in Las Vegas regarding the circumstances of the shooting death of Trayvon Cole by a Metro Police Officer. On information and belief there were conflicting statements made by Metro Officers who testified in that Coroner's Inquest.

55. Shortly after the Coroner's Inquest during a Robbery Squad meeting, Sergeant Melton made comments regarding the Trayvon Cole shooting and the Coroner's Inquest. Those comments

included but were not limited to threats by Sergeant Melton who told squad members that there would be reprisals if there were ever to be testimony such as was given in the Trayvon Cole Coroner's Inquest again. Sergeant Melton stated that all Metro Officers were expendable and that they needed to protect "his department" and the Sheriff at all costs, including their lives.

56. During the squad meeting or meetings where these comments were made, Plaintiff, Detective Gordon Martines who was among the top five most senior officers on Metro spoke up during the squad meeting and expressed his disagreement with the statements made by Sergeant Melton about protecting the Department and the Sheriff at all costs, including Plaintiff's own life, because that is what he was being paid for.

57. Plaintiff went on vacation starting on October 7, 2010.

58. On November 7, 2010 Plaintiff returned from his vacation to find that his Metro office desk had been ransacked and vandalized.

59. After discovering his ransacked desk, Plaintiff was then subjected to a very abusive and hostile reprimand, by Sergeant. Melton, which included an overall degrading of Plaintiff's performance as a police officer including all of the 32 years Plaintiff had, up until that time had with Metro.

60. Also included in Sergeant Melton's degrading and humiliating treatment of Plaintiff were insinuations that because of Plaintiff's ethnic Hispanic origin and the ethnic origins of his previous Hispanic supervisors were the only reason Plaintiff continued to be employed in Law Enforcement.

61. Sergeant Melton also reprimanded Plaintiff and stated that his desk and files were disorganized. The only reason for the disorganized state of Plaintiff's files was that Sergeant

Melton and others had actually ransacked and vandalized Plaintiff's desk while Plaintiff was on vacation, including both Metro property and his personal property.

62. An Internal Affairs Bureau "IAB" complaint was then manufactured against Plaintiff for having a 'messy desk". That IAB Complaint remains unresolved as of the date of this First Amended Complaint.

63. Plaintiff was also informed that it didn't matter to Sergeant Melton, how old Plaintiff was at 60 , or what Plaintiff's religion was. Plaintiff was further informed that he was relieved of duty and was immediately transferred out of the Robbery Section where Plaintiff had spent the previous 15 years and that he would be immediately sent to the Cold Case Squad. Further Plaintiff was informed that all his criminal cases were to be re-assigned to other Detectives. Plaintiff's life was then obliquely threatened Twice by Sergeant Melton.

64. Plaintiff then filed a crime report regarding the threats made by Sergeant Melton under report number 101121-3882 for Threats to Life, Malicious Destruction of Official Files, Evidence, and Documents, Obstructing Justice, Obstructing a Police Officer and Battery against a Police Officer the victim Detective Martines being over 60 years old. This report was created and submitted by Plaintiff and later investigated and charges later added by Det. K. Jordan of the LVMPD violent crimes section, via emails and phone conversations.

65. On or about November 7, 2010 at the time of the threats made against his life, the ransacking of his desk, the diminishment of his duties, his transfer and other malicious, fraudulent and oppressive actions against Plaintiff and on information and belief, these actions against Plaintiff caused his Diabetes Disease, Hypertension Disease and Coronary Artery Disease to be exacerbated, whereby his eyesight became blurry, Plaintiff experienced headaches, chest pain, jaw pain, nausea and dizziness. Plaintiff believed he was having a heart attack. Or stroke.

66. Plaintiff then immediately informed Sergeant Melton that he would be going home sick and then left the office, to later seek medical attention from Plaintiff's primary physician Dr. Evan Allen, M.D.

67. The actions against Plaintiff from November 7, 2010 to the present day have caused Plaintiff to suffer anxiety, fear, depression, nausea, vomiting, chest pain, fatigue, sleeplessness, and other physical and psychological symptoms, which eventually led to Plaintiff having Heart Surgery on September 9, 2011 which was performed by Dr. John Bowers at Desert Springs Hospital.

68. From November 7, 2010 to the date of the filing of this Verified First Amended Complaint, Plaintiff has sought proper medical attention for his Occupational Injury Claim.

69. In or about December of 2010, this claim was initially denied.

70. Plaintiff, on information and belief alleges that this denial of his Occupational Injury Claim was and is an oppressive and fraudulent act by Metro to inveigle Plaintiff into retaining the firm commonly used by Metro Officers, the Worker's Compensation Law firm of GGRM, allegedly to represent and fight for Plaintiff and his claim to get it reversed and approved. Plaintiff was forced to use his sick leave in the meantime, which was rather substantial (approx. 2200 hours), and to use his personal medical insurance to obtain any/all medical treatment and medications. Plaintiff was continually submitting monthly excuses from work to the Health and Safety Section from Dr. Evan Allen M.D., Plantiff's primary doctor, even up to the present date.

71. On June 1, 2011, Plaintiff was informed by Lieutenant. Ray Steiber, that under direct orders, regardless of Plaintiff's medical doctor's excuse or medical condition, that Plaintiff was to report to the camera room in the Downtown Area Command (DTAC) and resume duties there as of June 5, 2011.

72. It is well known among Metro Officers that the DTAC Camera room in Downtown Las Vegas is used by Metro Management to punish, isolate and contain officers who will not acquiesce in following the unlawful orders of Metro's Sheriff Gillespie and his upper management of Undersheriff, Deputy Chiefs, Captains, Lieutenants and Sergeants.

73. Plaintiff obeyed these orders to return to work at the DTAC Camera Room on Sunday, June 5, 2011, under duress and against his doctor's orders, and to avoid any future insubordination charge by LVMPD therefore, Plaintiff reported for duty to the DTAC Camera Room. One week later Plaintiff was visited by Lt. Ray Steiber at the Camera Room. Plaintiff explained to Lt. Steiber the details of the "Carter Case", and the "Informant Murder Case", in hopes that corrective action would be taken by Lt. Steiber.

74. On June 12, 2012, Plaintiff began to suffer the same symptoms he had suffered on November 7, 2010 and Plaintiff called in sick to work at the camera room to Sergeant Michele Royal. These same symptoms were previously reported to Sgt. Royal on June 12, 2012.

75. Plaintiff then filed another Occupational Injury Claim, and Plaintiff was later ordered by Metro's Health and Safety Division to see LVMPD'S Workers Compensation Cardiologist Dr. Keith Bowman for examination.

76. Plaintiff was examined by Dr. Bowman in an examination which lasted approximately 15 minutes. Plaintiff also explained to Dr. Bowman, the cover up of the "Carter Case" and the "Informant Murder Case". Dr. Bowman angrily said, "He didn't want to hear about it".

77. After this perfunctory examination Plaintiff's claim was denied by Dr. Bowman, who also noted that Plaintiff was to return to work at the same camera room job immediately, and that further heart testing would be scheduled at a later date at Metro's convenience and schedule.

78. Upon hearing these orders from Dr. Bowman Plaintiff immediately notified his primary care physician Dr. Evan Allen.

79. Dr. Allen immediately re-examined Plaintiff and set up an appointment with Dr. John Bowers a Cardiologist. Dr. Allen immediately approved the Occupational Injury Claim, which was in total contradiction to Dr. Bowman's earlier claim rejection and denial, and immediate return to work.

80. Plaintiff was then examined by Dr. John Bowers, who immediately set up a series of extensive heart tests, the results of which indicated that Plaintiff needed immediate heart surgery.

81. **Plaintiff then underwent heart surgery** by Dr. John Bowers, at Desert Springs Hospital on September 9, 2011.

82. Plaintiff's June 12, 2011 Occupational Injury Claim – Plaintiff's second Occupational Injury Claim was again **denied, even after the heart surgery**.

83. On April 13, 2012, after continued resetting of Administrative Appeals Court Dates and the exhaustion of Plaintiff's sick leave with Metro Plaintiff's case was heard by the Administrative Appeals Court.

84. On April 13, 2012, the **Administrative Appeals Court approved** and granted Plaintiff's Worker's Compensation claim and ordered that he receive consideration and benefits pursuant to the "Heart and Lung Bill" NRS 616 and 617, as of April, 13, 2012.

85.  After this Court Award Plaintiff continued to receive his full pay without interruption, and had most of his sick leave returned to him retroactive to only June 12, 2011, which was reflected on Plaintiff's Pay Stubs between June 12, 2011 with the last stub ending check on July 27, 2012.

86. Due to the fraudulent, malicious and oppressive actions of Defendants, from July 16, 2012 until at **least October 5, 2012**, no pay from Metro was deposited into Plaintiff's bank account at One Nevada Bank, and also no medical insurance benefits, and no worker's compensation benefits which are all controlled and administered by Metro directly through Sheriff Gillespie and his command staff. Plaintiff has also had his pay and benefits unlawfully taken from him as the 'back pay' finally deposited in his account went back only until September 13, 2012. This 'back pay' should have gone back until <u>July 16, 2012</u>.

87. Attorney Doris Nehme-Tomalka, Esq. of the law firm of Nehme-Tomalka & Associates 2620 Regatta Drive, Suite 102 Las Vegas, Nevada 89128 notified counsel for Metro on August 15, 2012 that she had assisted Gordon Martines in preparing a discrimination and retaliation Complaint against Metro.

88. Said retaliation complaint was also filed in the United States District Court for the District of Nevada on August 14, 2012, under case number 2:12-cv-01441-LDG-PAL.

89. On the next day, August 15, 2012, counsel for Metro emailed attorney Nehme-Tomalka confirming that he had already known about the filing but had not yet seen the Complaint. Metro then sent Plaintiff Detective Martines a pre-termination letter dated 8-16-12 which was received by Plaintiff on August 20, 2012.

90. Defendants have unlawfully retaliated against Plaintiff based on a) his Hispanic background and name; b) the exercise of his First Amendment Rights in speaking up and refusing to take actions which are against the law and against the public policies of the State of Nevada; c) the filing of, and successful award of a Worker's Compensation Claim against Metro; d) Plaintiff's filing of an EEOC Complaint against Metro e) the filing of the Original Complaint in this case, for speaking out against and refusing to go along with the evidence mishandling in the Carter Case, and for continuing to investigate the Informant (Alamo) Murder case, and

inform his superiors of the possible involvement of Metro Officers in a conspiracy to identify and have the informant murdered.

91. As part of this retaliation, Plaintiff was unlawfully terminated from his Employment with Defendant Metro on or about July 16, 2012.

92.  Defendant Metro's decision to terminate plaintiff was motivated by plaintiff's expressions on matters of public concern.

93.  Defendants' actions deprived plaintiff of his rights protected by the First Amendment to the U.S. Constitution under color of state law, in violation of 42 USC § 1983. Defendant's agents acted in the course and scope of the authority granted it by the State of Nevada and pursuant to defendant Metro's policy or practice of terminating Metro employees who address matters of public concern.

94. Defendant Sheriff Douglas Gillespie is and was the catalyzing force which started the retaliatory, actions against Plaintiff and Gillespie ordered such actions carried out and – or, was aware of and – or, directed the actions against Plaintiff which were carried out by the Sheriff's command staff.  At all times relevant Gillespie ordered such actions and – or was aware that Sgt. James Melton, Lt. Clinton Nichols, Captain Patrick Neville, Deputy Chief James Owens, Lt. Ray Steiber, Director Walter Norris, Asst Sheriff Theodore Moody, Undersheriff James Dixon, Dr. Keith Bowman, Director Judy Bleak, Director Michael Synder and Director Jeffery Roch , violated Nevada Law, Federal Law and written Metro policies, by retaliating and conspiring against Plaintiff thus:

95. Each of the actions stated herein was done in agreement with the other individual Defendants named in the complaint and was part of a conspiracy against Plaintiff Martines. Each of these acts was done to silence and retaliate against Martines' for exercising his constitutional

rights.  All to the acts complained of were acts of Oppression under Color of Law against Martines.

96. SGT. JAMES MELTON "Melton":

Melton is and was the main facilitator and supervisor of Plaintiff and other Metro Detectives. He  carried out direct orders from superiors and staff to enlist, persuade, and implicate or illegally order Plaintiff Martines and his partner Araujo to participate in the cover up and falsification of evidence and documents and illegal actions by other members of the Police Department regarding  the evidence collected removed and then falsely reported in the Carter Case.  Melton was the main and direct individual who made retaliatory threats to Plaintiff's life, who made repeated discriminatory and derogatory comments to Plaintiff.  It was Melton who unlawfully, in retaliation and at the behest of his superiors including but not limited to Douglas Gillespie relieved Plaintiff of his duties, transferred Plaintiff to a punishment assignment at the DTAC Camera Room.  Melton lead and assisted in the  ransacking of Plaintiff's  desk and the destruction of  police files, evidence, and criminal cases which were in Plaintiff's duty desk in the Robbery Section of the Department.  Melton was the cause of exacerbating Plaintiff's medical condition which later resulted Plaintiff having two heart surgeries and the exacerbation of other of Plaintiff's Medical conditions. What is more, Melton approved of, and failed to intervene in the unlawful termination of Martines from the Department.

97. Each of the actions stated herein was done in agreement with the other individual Defendants named in the complaint and was part of a conspiracy against Plaintiff Martines.  All of the individual Defendant's  activities regarding Martines' were done out of personal animus and at the direction of Sheriff Gillespie who was also acting out of personal animus against

Martines and to cover up his own criminal activity and the criminal activity of his command staff – the individual defendants named in this complaint.

98. LT. CLINTON NICHOLS "Nichols":

Nichols directly ordered that Martines be removed relieved or otherwise alienated from police duties and assignments as well as removed from other detectives, ordered Melton to approach and try and implicate Martines in, and illegally order Martines to join the conspiracy to cover up and falsify evidence and documents in the Carter Case. Further, Nichols refused verbally to intervene and correct the unlawful actions taken by Melton and Staff which were directly communicated to Plaintiff by telephone. Nichols refused to require that an IAB investigation proceed regarding false charges made against Martines and Nichols refused or failed to otherwise intervene in stopping the false and defamatory IAB complaints made against Plaintiff. Such IAB complaints were baseless and no investigation or interviews with Martines have ever been initiated or completed which is in derogation of Department Policy and Nichols duty as a police officer and Lieutenant for the Department. Further, Nichols refused to address the ransacking and burglary of Plaintiff's duty desk, the unlawful removal of criminal investigation files and evidence from that desk. Nichols also actively discouraged Martines from contacting Nichols and refused to discuss with Martines the reasoning of Sheriff Gillespie and other upper management officials who unlawfully targeted Martines for retaliation and attempts at ruining Martines' career. What is more, Nichols approved of, and failed to intervene in the unlawful termination of Martines from the Department.

99. Each of the actions stated herein was done in agreement with the other individual Defendants named in the complaint and was part of a conspiracy against Plaintiff Martines.

100.    CAPTAIN PATRICK NEVILLE "Neville":

Neville condoned and approved of the cover up and falsification of documents and evidence in the Carter Case and was fully aware of all the illegal steps being taken to cover up the mishandling of the evidence.  In addition, Neville is on link in a Chain of command failure to intervene and correct illegal actions taken by subordinates in retaliation against Martines for refusing to take part in the cover up and conspiracy to falsify evidence in the Carter Case, as well as for Martines' filing of an EEOC complaint against the Department.  What is more, Neville approved of, and failed to intervene in the unlawful termination of Martines from the Department.

101.    Each of the actions stated herein was done in agreement with the other individual Defendants named in the complaint and was part of a conspiracy against Plaintiff Martines.

102.    DEPUTY CHIEF JAMES OWENS "Owens":

Owens being in the Chain of Command between Martines and Sheriff Gillespie and other subordinate and superior officers and employees of the Department utterly failed in his duty to intervene and put a stop to the tortious and criminal  actions of his subordinates, Neville, Nichols and Melton.  Owens approved of the criminal and tortious actions of his subordinates in retaliating against Martines and, despite the fact that he is simply a craven 'yes man' to Douglas Gillespie's criminal enterprises, he has a duty as a sworn police officer to investigate and take action against criminal behavior when he learns of it, Owens failed to do so.

103.    Each of the actions stated herein was done in agreement with the other individual Defendants named in the complaint and was part of a conspiracy against Plaintiff Martines.

104. LT. RAY STEIBER "Steiber":

Steiber replaced Nichols as commander of the Robbery Section where Martines' had spent 15 years with an unblemished record before the retaliation against Plaintiff. Steiber failed to intervene and correct criminal actions by these other individual Defendants after being briefed by Martines as to the Carter Case Cover up, the Alamo Murder cover up. Steiber carried out direct unlawful orders by upper management by ordering Martines to punishment detail at the Downtown Area Command "DTAC" Camera Room. Steiber also ordered Martines to go back to work against doctor's no work order. Steiber was Advised directly by Martines of criminal misconduct by Melton , and conspirators Nichols, Neville, Owens, Moody, Gillespie and the retaliation commencing on or before November 7, 2010 and continuing to the present day.

105. All of Steiber's activities regarding Martines' were done out of personal animus and at the direction of Sheriff Gillespie who was also acting out of personal animus against Martines and to cover up his own criminal activity and the criminal activity of his command staff – the individual defendants named in this complaint.

106. As Acting Commander of the Robbery/Homicide section of the Department, Steiber assisted and followed orders from upper management to cut off Martines' Department pay and Benefits in July of 2012 and also to arrange pre-termination hearing for Martines with UnderSheriff Dixon as part of the pattern of retaliation against Martines. Steiber was made aware of all acts of misconduct of the Command Staff and all the individual Defendants by letters and faxes sent by Martines to the Department, including Steiber, such letters and faxes advising any and all members of the Robbery Homicide section of the circumstances and retaliation against Martines along with the criminal activities of the named individual Defendants. Steiber failed to intervene and correct these criminal acts and policy violations,

-22-

acting under direct orders from superiors, Owens, Moody, Gillespie, just a yes man and a buffer for Gillespie.

107.    DIRECTOR WALTER NORRIS "Norris":

Norris processed Plaintiff Martines' first EEOC complaint.  Norris attended the mediation hearing on behalf of LVMPD.  During the Mediation Hearing, Norris acted in a disruptive and retaliatory manner.  When Martines' attorney mentioned that if the entire matter about Martines' being targeted by Sheriff Gillespie and his command staff for Retaliation was to be discussed, that it must be discussed in the context of  the illegal activities by Sheriff Gillespie and his command staff regarding Martines' refusal to cover up evidence in the Carter Case. Norris response to this was to accuse Martines of "extortion" against the LVMPD and then leaving the meeting and not returning.  All of Norris' activities regarding Martines' were done out of personal animus and at the direction of Sheriff Gillespie who was also acting out of personal animus against Martines and to cover up his own criminal activity  and the criminal activity of his command staff – the individual defendants named in this complaint. Norris was eventually removed from being director of Diversity Section and returned to uniform duty at the airport section.

108.    DIRECTOR JUDY BLEAK "Bleak":

Bleak was directly responsible under direct orders from Gillespie, to unlawfully withhold pay and benefits from Martines, and to cause mental and physical harm by cutting off completely any/all income and benefits before any required pre-termination hearing or process was held regarding Martines' supposed employment with the Department.  Bleak, acting at the direction of Sheriff Gillespie falsified pay stubs from September 16, 2012 to October 5, 2012 and caused the accrued leave belonging to Martines' to be kept by the Department – which

amounts to a grand larceny, embezzlement and other criminal charges. Bleak has withheld from Martines' his pay stubs, and benefits under direct orders from Gillespie.

109. ASSISTANT SHERIFF THEODORE MOODY "Moody":

Moody was made completely aware of all facts and circumstances regarding illegal acts, criminal cover ups, and policy violations committed by subordinates and he failed to intervene and correct these actions despite the requirement that he do so as a sworn peace officer in Nevada and a member of the Department. Moody directly ordered, condoned, and supported subordinates, Owens, Neville, Nichols, Steiber, Melton and other directors to engage in unlawful acts, regarding salary, benefits, criminal cover ups, destruction of evidence, and falsifying documents. This has been a common practice and pattern of conduct at the Department for many years. Martines made a formal complaint against Moody tines (?) in 1995, for making several direct, derogatory, and discriminatory ethnic insults, while he was Martines's supervisor in the Robbery Section. No action was taken by supervisory personnel against Moody for his actions against Martines and the matter was closed and forgotten. Moody's personal animus, and his desire to carry out the personal will of Sheriff Gillespie are the reasons for his actions against Martines.

110. UNDERSHERIFF JAMES DIXON "Dixon":

Dixon was advised by Martines, by letter, and by phone call initiated by Dixon, of the Carter Case Cover Up, the Alamo Murder Cover up, Suave Lopez Fatal Shooting cover up, IAB complaint cover up, the Henry Prendes execution cover up, Martines's pay and benefits unlawful withholding and cover up, desk ransacking and personal property thefts, threats to life, and intelligence section bombing cover up and murder involving the Hell's Angels outlaw motorcycle gang and others. Dixon failed to investigate, intervene and correct criminal acts and misconduct and policy violations by numerous members of the Department

and subordinates under his direct supervision and control.  Dixon is also the highest

commissioned officer in the department.

111.    DIRECTOR MICHAEL SYNDER "Snyder":

112.    Snyder is considered an employee relations manager – director His name is on the pre-

termination documents which he later rescinded after undersigned counsel informed him that

Martines was represented by a lawyer.  Snyder acted upon the direct orders of Sheriff

Gillespie.

113.    DIRECTOR JEFFERY ROCH "Roch",

Roch handles all health and safety issues at the Department.  Roch works directly under

orders from Gillespie Roch does not question the validity of documents or circumstances. If

Gillespie tells him to do something, no matter how wrong or criminal Roch follows

Gillespies orders to the letter and does not vary from them.  Roch acted at all times on behalf

of Gillespie's personal animus and intent to cover up Gillespie's criminal behavior regarding

several cover ups in the Department.  Roch handles all health and safety issues after getting

permission from Gillespie.  Roch was formerly a traffic officer and was injured and

paralyzed  from accident.  Roch feels completely dependent on Gillespie for his job and does

Gillespie's bidding no matter the cost or legality.

114.    SHERIFF DOUGLAS GILLESPIE "Gillespie":

Any and all actions against any employee must be sanctioned and approved by Gillespie,

with no exceptions.  He is the head of the entire department and thus is responsible for any

and all actions committed by the employees of the department.  Common practice and pattern

is any/all disciplinary actions and criminal cases involving employees are reviewed by and

Gillespie intervenes in the case.   Gillespie is known as a micro manager and his intervention

in all personnel matters and any criminal allegations against members of the Department is

-25-

the standard with Gillespie and has been for years. Gillespie has a personal vendetta against Martines' because Martines' has refused to participate in Department cover ups and corruption. Also, Martines' filing of an ethics complaint against him in May of 2010 was the beginning of Gillespie's campaign of vendetta, vengeance and retaliation against Martines. Corruption is the norm in Gillespie's administration and threatening employees' jobs and lives is common practice, if necessary, to gain their compliance with Gillespie's corrupt practices.   Very few officers or command staff have the courage or leadership quality to stand up to this kind of treatment because Gillespie has so much individual power in the department.

115.    All of the actions taken against Plaintiff by the named defendants herein above was done in agreement with the other individual Defendants named in this Second Amended Complaint and was part of a conspiracy against Plaintiff Martines.

116.    The animus against the Plaintiff, and its resulting conspiracy by these defendants to stigmatize, retaliate against, cut-off the benefits of, cut-off the salary of, unlawfully and unconstitutionally take the salary and benefits of,  make false and defamatory written and verbal statements about, constructively and-or actually terminate the employment of, Plaintiff all violation of his well-established Federal and State Civil and legal Rights, this animus is rooted in Plaintiff's exercise of his First Amendment Rights, his rights to file a lawsuit against his employer – Metro, his rights to refuse to take part in actions which are against the law and the public policy of Nevada and the United States and his right to file and prosecute a Workers Compensation Insurance Claim and to be paid under such claim.

117.    Plaintiff was under no duty to follow the unlawful orders of Sergeant James Melton or any other member of Metro Command Staff's unlawful orders to take part in the cover up of and the actual falsification of evidence against criminal suspects and defendants.

118.    Metro, is a creature of Statute.  As such it controls all facets of what is called Human Resources, that is ( is ) controls its officers hiring, firing, pay, workers compensation, medical insurance benefits, vacation, sick leave, other leave and all reporting, and record keeping of such pay and leave as reported on pay stubs to officers.

## PARTIES

119.    Defendant Las Vegas Metropolitan Police Department ("Metro") is a public entity established by the laws the State of Nevada, and is charged with performing certain law enforcement functions within Clark County and the City of Las Vegas, and employs other defendants in this action.

120.    At all times relevant hereto, Defendant Douglas Gillespie (Gillespie) was the Sheriff of Clark County and the Commanding Officer of Defendant Las Vegas Metropolitan Police Department.

121.    At all times relevant hereto, Defendant Captain Patrick Neville was Captain of The Robbery/Homicide Bureau of Defendant Metro, and reported directly to and took orders directly from Defendant Gillespie.

122.    At all times relevant hereto, Defendant Lt. Clinton Nichols was the Commanding Officer of the Robbery Section Detective Squads of Defendant Metro.

123.    At all times relevant hereto, Defendant Sgt. James Melton was the Squad 21 Sgt. Supervising Officer of Squad 21 of the Robbery Section  of Defendant Metro.

124.    At all times relevant hereto, Defendant James Owens was the Deputy Chief of the Investigative Services Division of Defendant Metro.

125.    At all times relevant Asst. Sheriff Theodore Moody was supervisor over Deputy Chief James Owens of Defendant Metro.

126.     At all times relevant Director Walter Norris, of the Diversity Section, was under the direct orders of Sheriff Gillespie of Defendant Metro.

127.     At all times relevant Director Jeffery Roch, of the Health and Safety Section, was under the direct orders of Sheriff Gillespie of Defendant Metro.

128.     At all times relevant, Lt. Ray Steiber, was commanding the Robbery Section and acting Captain of the Robbery/Homicide Bureau, of defendant Metro and was under direct orders from Sheriff Gillespie of Defendant Metro.

129.     At all times relevant, Dr. Keith Bowman, the Workers Compensation - Metro Cardiologist, was under direct orders from Sheriff Gillespie.

130.     At all times relevant, Director Michael Synder, Director of Labor Relations, was under direct orders of Sheriff Gillespie of Defendant Metro.

131.     At all times relevant, Under Sheriff James Dixon, the highest commissioned police officer in the Metro Police department, was under direct orders from Sheriff Gillespie of Defendant Metro.

132.     As a result of the actions and failures to act of all Defendants as shown in Causes of Action One through 14 below, Plaintiff has been damaged in an amount greater than $3,000,000.00.

133.     At all times relevant, Director Judy Bleak, was in Charge of the Finance section of Metro, and was under direct orders from Sheriff Douglas Gillespie of Defendant Metro.


## **FIRST CAUSE OF ACTION**
### **(Race Discrimination/Disparate Impact in violation of §1981)**

134.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

135. Plaintiff has been discriminated against in the workplace because of Plaintiff's race. Among the discriminatory actions taken by Plaintiff's employer are the following:

a. Plaintiff was transferred to a different unit than the one he had been assigned to work in for the 15 years prior to the incidents alleged herein, despite Plaintiff's exemplary performance within his then current unit;

b. Plaintiff's cases and files, those which Plaintiff had been working on for a significant period of time, were stripped from him and allegedly reassigned to other detectives or destroyed unknown status;

c. Plaintiff's work desk was ransacked by his fellow co-workers and superiors during his absence from work;

d. Plaintiff's case files were tampered with and were removed from his work desk, as were key pieces of evidence which Plaintiff was examining as part of his ongoing investigations in his duties as a detective;

e. Plaintiff was degraded in the presence of his fellow co-workers, and his integrity and work performance were called into question, without any reasonable justification for the same.

f. Plaintiff was subjected to comments that caused him to believe that his safety was in jeopardy, and such comments included but were not limited to, "what if you die." This statement was made more than once, and Plaintiff was verbally told that he was relieved from his duties as a detective immediately after this threat was made to him.

g. Plaintiff was relieved of duty on November 7, 2012.

h. Plaintiff was subjected to negative comments which implied that Plaintiff was still employed by the Defendant only because Plaintiff had been previously supervised by

-29-

Hispanic superiors/sergeants and were as stated by Defendants, ethnically sympathetic toward Plaintiff.

137.     In comparison to the manner in which Plaintiff was treated, other similarly situated employees of Defendant who were not of the same race and/or national origin as was Plaintiff were not treated in the same negative manner as was the Plaintiff.

138.     There is no business necessity which justifies the actions or business practices of the Defendant, as those actions and practices were applied to the Plaintiff.

139. At the time of the discrimination, Plaintiff was a diabetic and was Hypertensive, and the actions to which he was subjected to have caused him to suffer exasperated symptoms and complications with his diabetes and his hypertension.

140.   As a result of the harassment and discrimination described herein, Plaintiff also suffered stress related symptoms which caused him to undergo numerous medical tests and procedures, including heart surgery, in order to help him cope with the adverse physical and mental consequences of the treatment to which he was subjected.

141.   Plaintiff has in fact suffered a disparate impact resulting from Defendant's actions, inactions, and policies and has been damaged in an amount in excess of $10,000.00.

142.   Additionally, the conduct of Defendant and its employees has been malicious, fraudulent and oppressive and was designed to vex, annoy or harass Plaintiff and thus Plaintiff is entitled to punitive damages under §1981 in an amount in excess of $10,000.00.

143.   As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to his attorneys' fees and costs of suit as provided by §1981.

//

//

## SECOND CAUSE OF ACTION
### HARASSMENT

144.   Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein

145.  During his employment as a Detective for the Defendant, Plaintiff was subjected to negative comments made by his superiors in the workplace.

146. Although Plaintiff had complained to the Defendant about being harassed and about being subjected to these negative comments, and although Plaintiff filed a Charge of Discrimination with the EEOC, Plaintiff believes that the Defendant ratified the actions and inactions of his superiors and of the Sergeants involved.

147.  In addition to the harassing conduct identified in Paragraph 13 hereinabove which Plaintiff was subjected to, Plaintiff also became the target of an IAB investigation containing numerous policy violations, was instructed to refrain from contact with other workers, witnesses and suspects, and he has lost overtime.

148.        The harassment and demeaning accusations, all of which were unfounded and fabricated with a specific motive to harass and target Plaintiff, did in fact create a stressful, dangerous and intolerable work environment for Plaintiff.

149. At the time of the harassment, Plaintiff was a diabetic and hypertensive, and suffers from Sleep Apnea and utilizes mandated CPAP therapy from previous on-duty work related injuries, the actions to which he was subjected to have caused him to suffer exasperated symptoms and complications with his diabetes and his hypertension.

150. As a result of the harassment described herein, Plaintiff also suffered stress related symptoms which caused him to undergo numerous medical tests and procedures in order to help him cope with the adverse physical and mental consequences of the treatment to which he was subjected.  In one year's time since November 7, 2010, over $8,000.00 in medications

alone. This includes but is not limited to Heart Surgery on Sept 9, 2011, and another Heart Surgery Scheduled for November 21, 2012, and further Heart related therapies and treatments.

151.     The above described harassing treatment was in violation of Title VII, of the Civil Rights Act of 1964, as amended and Nevada Revised Statutes Chapters 613.310 through 613.435, inclusive.

152.     As a direct and proximate result of the unlawful conduct by the Defendants who expressly carried out the harassment and of the Defendants who ratified it and permitted it to continue, Plaintiff suffers and continues to suffer thousands of dollars in the form of lost income and lost overtime, and loss of benefits and additional amounts of money he would have received had said Defendants not violated his rights.

153.     Plaintiff has suffered mental anguish, physical distress and humiliation.

154.     As a result of said conduct, Plaintiff has suffered damages in an amount within the Court's jurisdiction according to proof, including but not limited to incurring attorneys' fees and litigation costs to which Defendant(s) is responsible, and Plaintiff will seek leave to amend this Complaint accordingly or will seek damages according to proof at trial.

155.     Plaintiff is informed and believes and thereon alleges that in taking the actions alleged above, all Defendants acted with malice, fraud or oppression, indifference and in reckless disregard of Plaintiff's rights, with the intent to cause injury and emotional distress to Plaintiff.

156.     The conduct of the Defendant was outrageous and despicable and warrants the award of punitive damages, against all the named Defendants in an amount sufficient to punish Defendants and make an example of them.

### THIRD CAUSE OF ACTION
**Age Discrimination**

157.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

158.     The Age Discrimination in Employment Act (ADEA) makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

159.     The (ADEA) applies to a broad range of employment practices, including discrimination because of age in placement, promotion, demotion, transfer, and discipline.

160.     The (ADEA) also prohibits age discrimination with respect to all terms and conditions of employment, discrimination regarding salary, leave, and other benefits.

161. Plaintiff was discriminated against and harassed based on his age, and the treatment that Plaintiff was subjected to, includes but is not limited to the following;

    a.   Being transferred to a different unit than the one that Plaintiff had been assigned to work in for the previous fifteen (15) years, despite Plaintiff's exemplary performance within his then current unit;

    b.   Having his case files and responsibilities stripped form him and reassigned to other detectives and relieved of Duty on November 7, 2012;

    c.   Having his seniority called into question based on his age (60 years of age);

    d.   Having been subjected to threats such as "what if you die" more than one time;

    e.   Being denied leave opportunities, use of PTO time and being forced to use vacation time, medical leave, while other employees of Defendants were not held to the same standards.

162.     Plaintiff has suffered mental anguish, physical distress and humiliation.

163.     As a result of said conduct, Plaintiff has suffered damages in an amount within the Court's jurisdiction according to proof, including but not limited to incurring attorneys' fees and litigation costs to which Defendant(s) is responsible, and Plaintiff will seek leave to amend this Complaint accordingly or will seek damages according to proof at trial.

164.     Plaintiff is informed and believes and thereon alleges that in taking the actions alleged above, all Defendants acted with malice, fraud or oppression and in reckless disregard of Plaintiff's rights, with the intent to cause injury and emotional distress to Plaintiff.

165.     The conduct of the Defendant was outrageous and despicable and warrants the award of punitive damages, against all the named Defendants in an amount sufficient to punish Defendants and make an example of them.

### FOURTH CAUSE OF ACTION
### Retaliation in violation of 42 USC §1981

166.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

167.     Plaintiff engaged in protected activity and specifically complained that certain supervisory personnel were treating him differently in workplace based on his minority status and age.

168.     After Plaintiff complained, complained he was subjected to adverse treatment including but not limited to, an opened IAB investigation, instructed to refrain from contact with suspects, lost overtime and was subjected to different standards for his leaves of absence.

169.     The adverse treatment which Plaintiff was subjected to was a result of his

engaging in a protected activity including but not limited to objecting to and refusing to engage in the mishandling of evidence and its cover-up in the Carter Case, continuing to investigate the Alamo Murder Case, objecting to the cover up and falsification of evidence in the Suave Lopez and Henry Prentiss cases, among others.

170.     As a result of Defendant's actions and inactions, Plaintiff has been damaged in an amount in excess of $3,000,000.00.

171.     The conduct of Defendant and its employees have been malicious, fraudulent and oppressive and was designed to vex, injure, annoy or harass Plaintiff and thus  Plaintiff is entitled to punitive damages under §1981 in an amount in excess of $3,000,000.00.

172.     As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to his attorneys' fees and costs of suit as provided by §1981.


## FIFTH CAUSE OF ACTION
**(Violation Of Civil Rights –  Taking Property Without Due Process,  Unlawful Restraint Of The First Amendment Right To Free Expression - 42 U.S.C. § 1983)**
**(Against All Defendants)**

173.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

174.     This is an action at law for money damages arises under 42 U.S.C. § 1983 and the United States Constitution, the laws of the State of Nevada and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiff by said statutes, and by the First, Fifth, and Fourteenth Amendments of the United States Constitution.

175.     Defendants, as stated in the allegations above, have acted to restrain plaintiff's free speech rights and to take his property, that being the salary, salary differential and

Workers Compensation Payments, as well as accrued leave and other benefits which are the appurtenances and part of his monetary remuneration at Defendant Metro.

176.     Commencing at or about  November 7, 2010 and  without legal cause or justification, and acting under color of law, Defendants  Sgt. James Melton, Lt. Clinton Nichols, Captain Patrick Neville, Deputy Chief James Owens, Lt. Ray Steiber, Director Walter Norris, Assistant Sheriff Theodore Moody, Undersheriff James Dixon, Dr. Keith Bowman, Director Judy Bleak, Director Michael Synder and Director Jeffery Roch ,  and DOES 1-10 and each of them, fraudulently, intentionally and maliciously deprived Plaintiff of rights secured to him by the First, Fifth, and Fourteenth Amendments to the United States Constitution in that Defendants and each of them, subjected Plaintiff to restraint of his First Amendment Free Speech Rights,  Free Speech Rights under the Nevada Constitution, the unlawful taking of taking of  Plaintiff's property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and a civil and unlawful conspiracy to do these acts.

177.     Defendants, and each of them, carried out and perpetrated the mutually supportive conspiracy to deprive Plaintiff of his rights by participating in a corrupt effort to illegally restrain Plaintiff's free speech rights by the use of retaliation, false charges within Metro, defamation, the seizing of Plaintiffs salary and benefits and attempts to fraudulently retaliate against and terminate Plaintiff from his employment at Metro.

178.     As a proximate result of the aforesaid acts and omissions of Defendants, and each of them, Plaintiff sustained financial harm in excess of $10,000.00, great physical and mental pain and shock to his nervous system, fear, anxiety, torment, degradation and emotional distress and accompanying severe physical injury to his body.

179.     By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiff was injured and incurred medical and therapeutic expenses in an amount to be proved at trial.

180.     In addition, by reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiff was kept from attending to his usual occupations, and has suffered loss and impairment of earnings and employment opportunities all to his damage in an amount to be proven.

181.     By reason of the aforementioned acts of Defendants, and each of them, Plaintiff was compelled to secure the services of an attorney at law to redress the wrongs hereinbefore mentioned and by virtue thereof, Plaintiff is indebted and liable for attorney's fees.

182.     The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully and maliciously, with the intent to harm, injure, vex, harass and oppress Plaintiff with a conscious disregard of Plaintiff's constitutional rights and by reason thereof, Plaintiff seeks punitive and exemplary damages from Defendants, and each of them, (except Defendant METRO) in an amount as proved at trial.

### SIXTH CAUSE OF ACTION
**(Unlawful Custom And Practice Under 42 USC 1983 Monell Claim)**
**(Against Defendant LAS VEGAS METROPOLITAN POLICE DEPARTMENT and GILLESPIE)**

183.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

184.     Defendant METRO is and at all times herein mentioned has been a public entity duly authorized and existing as such in and under the laws of the State of Nevada; and at all times herein mentioned, Defendant METRO and GILLESPIE, possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the

operation of the Las Vegas Metro Police Department and its tactics, methods, practices, customs and usages related to internal investigations, personnel supervision and records maintenance, and the proper uses of force by its rank and file, generally.

185.    At all times herein mentioned, Defendants, and each of them, were employees acting under METRO's direction and control, who knowingly and intentionally promulgated, maintained, applied, enforced and suffered the continuation of policies, customs, practices and usages in violation of the First, Fifth and Fourteenth Amendments respectively to the United States Constitution, which customs, policies, practices and usages at all times herein mentioned required and encouraged the employment, deployment and retention of persons as peace officers who have demonstrated their brutality, dishonesty, and numerous other serious abuses of their powers as peace officers in the employment of the METRO.

186.    Defendant METRO knowingly maintains and permits official sub-rosa policies or customs of permitting the occurrence of the kinds of wrongs set forth in the allegations in paragraphs above, by actually ordering and directing such abuses and unlawful conduct as well as through deliberate indifference to widespread police abuses, failing and refusing to impartially investigate, discipline or prosecute peace officers who commit acts of retaliation, the violation of free speech rights and the taking of property without due process in violation of law, each ratified and approved by METRO, GILLESPIE each of the Defendants and others at METRO.

187.    The unconstitutional policies, practices or customs promulgated, sanctioned or tolerated by Defendants METRO, and GILLESPIE include, but are not limited to:

(1) Defendants METRO and GILLESPIE directed and ordered the retaliations and actions which punished Plaintiff's Free Speech Rights, and also directed and ordered the takings of Plaintiff's salary and benefits without due process of law. Defendants METRO and GILLESPIE had knowledge, prior to and since the

incidents, complained of herein of misconduct and retaliation of Plaintiff, a METRO Employee who

(1) exercised his free speech rights and;

(2) refused to carry out the unlawful orders of superior officers in violation of the Laws and Constitutions of the United States and the State of Nevada.

(3)   Defendants METRO and GILLESPIE  unlawfully retaliated against Plaintiff for refusing to carry out unlawful orders and for refusing to become part of a criminal conspiracy and cover-up regarding the mishandling and fabrication of evidence in the above referenced 'Carter Case'.

(4)   Defendants METRO and GILLESPIE and Defendants Lt. Clinton Nichols, Sgt. James Melton, Lt. Ray Steiber, Director Walter Norris, and IAB investigators and Supervisors, refused to competently and impartially investigate allegations of abuse and misconduct made by Plaintiff, against Metro Officer former Lt. John Alamshaw, who was a suspect in the case involving the murder, alleged to have involved Metro Officers handing over the identity of a confidential informant who was suspected and alleged to have been murdered, and been committed by Las Vegas Metropolitan Police Department officers

(5) Defendants METRO and GILLESPIE and J. Dixon, W. Norris, T. Moody, J. Owens, P. Neville, C. Nichols, J. Melton, J. Roch, M. Synder,  IAB Section, covered up acts of misconduct and abuse power against Plaintiff by Metro Police Department Command officers and sanctioned, either tacitly or by a code of silence by and among officers;

(6)  Defendants METRO and GILLESPIE and J. Dixon, W. Norris, T. Moody, J. Owens, P. Neville, C. Nichols, J. Melton, J. Roch, M. Synder,  IAB Section rewarded officers who complied with unlawful orders and carried out retaliation against Plaintiff;

(7)  Defendant METRO and GILLESPIE failed to adequately supervise the actions of officers under their control and guidance;

(8)   Defendants METRO and GILLESPIE and IAB Section, Violent Crimes Section Supervisors  condoned and participated in the practice of failing to file criminal charges against officers accused of criminal wrongdoing groundless criminal charges for the purpose of insulating the METRO and its officers from civil liability by failing to forward criminal charges against individuals to the District Attorney;

(9)   Defendants METRO and GILLESPIE and IAB Section, Top Chain of Command Supervisors down to Sgt. James Melton condoned and encouraged a conspiracy of silence among their employees for the purpose of concealing and furthering wrongful and illegal conduct by their officers and employees;

(10) Defendants METRO and GILLESPIE fostered and encouraged an atmosphere of lawlessness, abuse and unconstitutional misconduct, which by and before November 2010 and thereafter, represented the unconstitutional policies, practices and customs of METRO including but not limited to punishing Plaintiff

for asserting his free speech rights and his duties as a sworn peace officer when Plaintiff voiced concerns by objecting to and refusing to engage in the mishandling of evidence and its cover-up in the Carter Case, continuing to investigate the Alamo Murder Case, objecting to the cover up and falsification of evidence in the Suave Lopez and Henry Prentiss cases, among others.

188.    By reason of the aforesaid policies, customs, practices and usages, Plaintiff's rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution were deprived.

## SEVENTH CAUSE OF ACTION
### (Tortious Discharge)

**(Employment Termination based on failure to act in violation of public policy and law) For Plaintiff objecting to and refusing to engage in the mishandling of evidence and its cover-up in the Carter Case, continuing to investigate the Alamo Murder Case, objecting to the cover up and falsification of evidence in the Suave Lopez and Henry Prentiss cases, among others.)**

189. Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

190. That Plaintiff Gordon Martines was employed by Metro;

191. That Metro demoted, re-assigned, harassed and discharged Plaintiff.

192. That Plaintiff's refusal to engage in a conspiracy to falsify evidence in the Carter Case was the motivating reason for Metro's discharge of Plaintiff; and

193. That the discharge has caused Plaintiff harm. Defendant Metro's decision to discharge, terminate and misappropriate Plaintiff's accrued leave was motivated by plaintiff's expressions on matters of public concern.

194. Defendants' actions deprived plaintiff of his rights protected by the First Amendment to the U.S. Constitution under color of state law, in violation of 42 USC § 1983. Defendant Metro's agents acted in the course and scope of the authority granted it by the County and pursuant to Defendant Metro's policy or practice of discharging and terminating Metro employees who address matters of public concern.

195. Between July 16, 2012 and October 5, 2012, Defendants caused Plaintiff's Pay and Benefits to be summarily cut-off.  This was an actual discharge of Plaintiff.

## EIGHTH CAUSE OF ACTION
### Tortious Constructive Discharge
**(Employment Termination based on failure to act in violation of public policy and law – The Carter Case)**

196. Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

197. That Plaintiff Gordon Martines is or was employed by Metro;

198. That Metro demoted, re-assigned, harassed, threatened and discharged Plaintiff.

199. That Plaintiff's speaking out against and his refusal to engage in a conspiracy to falsify evidence in **the Carter Case -** which is and was a matter of public concern - was the motivating reason for Metro's discharge of Plaintiff; and

200. That the discharge has caused Plaintiff harm.

201. Defendant Metro's decision to discharge, terminate and misappropriate Plaintiff's accrued leave was motivated by plaintiff's expressions on matters of public concern.

202. Defendants' actions deprived plaintiff of his rights protected by the First Amendment to the U.S. Constitution under color of state law, in violation of 42 USC § 1983. Defendant Metro's agents acted in the course and scope of the authority granted it by the County and pursuant to Defendant Metro's policy or practice of harassing, demoting, re-assigning and constructively or actually discharging and terminating Metro employees who address matters of public concern.

203. Between July 16, 2012 and October 5, 2012, Defendants caused Plaintiff's Pay and Benefits to be summarily cut-off. This was an actual discharge of Plaintiff.

## NINTH CAUSE OF ACTION
### (Tortious Discharge)
**(Employment Termination based on failure to act in violation of public policy and law – Investigation and speech regarding the Informant Murder Case)**

204. Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

205. That Plaintiff Gordon Martines is or was employed by Metro;

206. That Metro demoted, re-assigned, harassed, threatened and discharged Plaintiff.

207. That Plaintiff's continued the investigation of and continued to speak out to officers and command staff regarding the **Informant Murder Case** which is and was a

matter of public concern and was the motivating reason for Metro's discharge of Plaintiff; and

208.   That the discharge has caused Plaintiff harm.

209.   Defendant Metro's decision to discharge, terminate and misappropriate Plaintiff's accrued leave was motivated by plaintiff's expressions on matters of public concern.

210.   Defendants' actions deprived plaintiff of his rights protected by the First Amendment to the U.S. Constitution under color of state law, in violation of 42 USC § 1983. Defendant Metro's agents acted in the course and scope of the authority granted it by the County and pursuant to Defendant Metro's policy or practice of harassing, demoting, re-assigning and constructively or actually discharging and terminating Metro employees who address matters of public concern.

211.   Between July 16, 2012 and October 5, 2012, Defendants caused Plaintiff's Pay and Benefits to be summarily cut-off.  This was an actual discharge of Plaintiff.

## TENTH CAUSE OF ACTION
### (Tortious Discharge)
### (Employment Termination based on Plaintiff's filing of and receipt of an Award of Worker's Compensation Benefits)

212.   Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

213.   That Plaintiff Gordon Martines was employed by Metro for approximately 34 years, the last 25 of which Plaintiff was employed as a Metro Detective;

214.   That Metro demoted, re-assigned, harassed, threatened and discharged Plaintiff.

215.    That Plaintiff's filing for, and award of , and his continued collection of Worker's Compensation Benefits was the motivating reason for Metro's discharge of Plaintiff; and

216.    That the discharge has caused Plaintiff harm.

217.   Defendant Metro's decision to discharge, terminate and misappropriate Plaintiff's accrued leave was motivated by plaintiff's filing of and receipt of benefits under a Worker's Compensation Claim.

218.   Between July 16, 2012 and October 5, 2012, Defendants caused Plaintiff's Pay and Benefits to be summarily cut-off.  This was an actual discharge of Plaintiff.

## ELEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

219.     Plaintiff  repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

220.     Defendant's behavior as outlined in the allegations herein, toward Plaintiff has been extreme and outrageous.

221.     Plaintiff has suffered serious emotional distress including serious and life threatening physical symptoms which were and are caused by Plaintiff's refusal to engage in evidence tampering and it cover up in the Carter case, his investigation and findings regarding Metro Narcotics' Division involvement in the Alamo Murder Case, as well as his making ethics violations complaints against Defendant Gillespie, as well as his outspokenness in general including his opposition to the mishandling of evidence in the Suave Lopez shooting, and the shooting death of Metro Sergeant Henry Prentiss.

222.     As a direct and proximate result of the negligent infliction of emotional distressful acts of Defendant, Plaintiff has experienced serious emotional distress and permanent physical injury including but not limited to, coronary heart disease, resulting in damages in excess of $3,000,000.00.

223.     Plaintiff has been forced to hire legal counsel in this matter and thus should recoup his attorney's fees and costs.

//

//

//

//

//

## TWELFTH CAUSE OF ACTION
### (Negligent Training and Supervision)

224.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

225.     Defendant has a duty to supervise its employees.

226.     Defendant's duty to properly train and supervise extends to all persons in its employ, including to Plaintiff.

227.     Defendant failed to properly hire, train and supervise its agents, servants or employees herein with respect to retaliation, anti discrimination laws, and the effects of such behavior, among other things.

228.     As a direct and proximate result of the breach of said duty, Defendant's agents', servants' or employees' unlawfully and willfully subjected Plaintiff to discriminatory and harassing treatment and retaliation in violation of Federal Law.

229.     As a direct and proximate result of the negligent acts of Defendant, Plaintiff is entitled to damages in excess of $3,000,000.00.

## THIRTEENTH CAUSE OF ACTION
### (VIOLATION OF 42 U.S.C. § 1985 (2))
### (Conspiracy to Deprive Civil Rights under Color of Law and Obstruction of Justice)
### (Against All Individual Defendants)

230.     Plaintiff refers to and re-pleads each and every allegation contained in the foregoing  paragraphs of this complaint, and by this reference incorporates the same herein and makes each a part hereof.

231.     Commencing on or about October 7, 2010, while Plaintiff was on vacation until on or about and after November 7, 2010 when Plaintiff returned to work at his Metro Robbery Section desk to find and discover it ransacked, his official files missing and

destroyed, his personal property stolen and facing a false, fraudulent and fabricated

Internal Affairs Bureau complaint about Plaintiff having a 'disorganized desk" and

thereafter, Defendants and two or more of them, in the State of Nevada, County of Clark,

by reason of Defendants' animus against Plaintiff conspired together to act and to fail to

act as hereinbefore alleged, for the purpose of impeding, hindering, obstructing, and

defeating the due course of justice in the State of Nevada and County of Clark in that

Metro and all other Defendants sought to silence and punish Plaintiff for refusing to be

part of a conspiracy to mishandle, fabricate and cover up such mishandling and

fabrication of evidence in the "Carter Case" his investigation and  findings regarding

Metro Narcotics' Division involvement in the Alamo Murder Case, as well as his making

ethics violations complaints against Defendant Gillespie, as well as his outspokenness in

general including his opposition to the mishandling of evidence in the Suave Lopez

shooting, and the shooting death of Metro Sergeant Henry Prendes as referenced above.

232.     Defendants, and each of them, purposefully, under color of law, planned and

conspired to deny Plaintiff equal protection of the laws by (a) denying the right to be free

from retaliation for the exercise of his right to free speech; and (b) denying the right not

to be deprived of property, that is Plaintiff's Metro Salary and Benefits and other

valuable chattels, without due process of law; and (c) denying the right not to be deprived

of the right to free expression under the First and Fourteenth Amendments to the U.S.

Constitution and the laws of United States and the State of Nevada.

233.     By virtue of the foregoing, Defendants, and each of them, violated 42 U.S.C. §

1985 (2).

234.     As a direct and proximate result of the foregoing, Plaintiff has been damaged as

recited above and demands and is entitled to the damages recited in the First Cause of

Action, including but not limited to, special general and punitive damages (in regard punitive damages this is except as to Defendants METRO) and attorney's fees.

**FOURTEENTH CAUSE OF ACTION**
**(VIOLATION OF 42 U.S.C. § 1986 - Failure to Intervene)**
**(Against All Individual Defendants)**

235. Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

236. Commencing on or before November 7, 2010 Defendants, and each of them knew and understood Plaintiff was being subjected to a deprivation of his constitutional rights and were in the position and had the duty and authority to intervene to prevent the wrongdoing committed against Plaintiff by Defendants.

237. Each of the Defendants failed to Intervene to prevent Plaintiff from suffering deprivation of his constitutional rights.

238. By virtue of the foregoing, Defendants, and each of them, violated 42 U.S.C. § 1986 and other laws of the United States and the State of Nevada.

239. As a direct and proximate result of the foregoing, Plaintiff has been damaged in an amount in excess of $3,000,000.00 and demands and is entitled to the damages recited in the First Cause of Action, including, but not limited to, general and punitive damages (in regard punitive damages this is except as to Defendant METRO)

//

//

//

//

**FIFTEENTH CAUSE OF ACTION**
**(CIVIL CONSPIRACY)**
**(Against all individual Defendants)**

240.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

241.     All of the Individual Defendants named herein with intent to harm, with malice, using fraud and for an improper and ulterior purpose of retaliating against plaintiff for using his First Amendment Rights, and for refusing to carry out and acquiesce to Metro's and Metro Command Staff's unlawful mishandling of and the conspiracy and cover up regarding the evidence in the Carter Case, in that Defendants lodged a false and misleading Internal Affairs complaint against Plaintiff and ransacked Plaintiff's desk, stole Plaintiff's personal property, misappropriated Metro's property, conspired to unlawfully relieve Plaintiff of duty without legal cause, terminate Plaintiff's employment, misappropriate Plaintiff's Metro Salary and Benefits, and other unlawful actions which were all done for unlawful purposes by agreement by, among and between the Defendants or two or more of them.

242.     Defendants Sgt. James Melton, Lt. Clinton Nichols, Captain Patrick Neville, Deputy Chief James Owens, Lt. Ray Steiber, Director Walter Norris, Assistant Sheriff Theodore Moody, Undersheriff James Dixon, Dr. Keith Bowman, Director Judy Bleak, Director Michael Synder and Director Jeffery Roch , and IAB  Section Officers and Staff in the aiding and abetting of the willful, malicious and fraudulent making of a false Internal Affairs complaint against Plaintiff all the wrongful acts stated in the paragraphs above each constitute acts in furtherance of this conspiracy.

243.     Defendant Metro's approval and Defendant Sheriff Gillespie in ordering his command staff to carry out such retaliatory actions, and Gillespie and the command staff's approval of such actions of retaliation against Plaintiff each constitute an act or acts in furtherance of this conspiracy to retaliate against Plaintiff for expression of his constitutional right to free speech, for the theft and conversion of his personal property, for the misappropriation of Metro property, for the misappropriation of Plaintiff's Metro Pay and Benefits, and other acts of retaliation against Plaintiff.

244.     Defendants' actions of retaliation against the Plaintiff were done without any legal cause or reason whatsoever, were done in furtherance of a Conspiracy to "Cover Up" or "White Wash" Defendants' unlawful conspiracy to silence Plaintiff in violation of his Civil Rights as well as to Cover Up the criminal behavior regarding the mishandling of evidence in the Carter Case, as well as retaliation for Plaintiff filing for and receiving Workers Compensation benefits  filing an EEOC Complaint and lawsuit for racial discrimination, refusal to engage in evidence tampering and it cover up in the Carter case, his investigation and findings regarding Metro Narcotics' Division involvement in the Alamo Murder Case, as well as his making ethics violations complaints against Defendant Gillespie, as well as his outspokenness in general including his opposition to the mishandling of evidence in the Suave Lopez shooting, and the shooting death of Metro Sergeant Henry Prendes and as an effort to force Plaintiff to retire from duty.

245.     The matter of the Internal Affairs complaint made against Plaintiff has not, after two years, been resolved.

246.     Plaintiff has been damaged in an amount in excess of $3,000,000.00 by Defendants acts and failures to act as alleged herein.

-48-

**SIXTEENTH CAUSE OF ACTION**
**(CONVERSION)**
**(Against all individual Defendants)**

247.    Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

248.    Police Officers, Sgt. James Melton and unknown other co-workers, in ransacking Plaintiff's desk while he was on vacation between October 7, 2010 and November 7, 2010 and taking and carrying away his personal property contained within the desk and depriving him of that property for a substantial period of time or forever, constitutes a distinct act of dominion wrongfully exerted over Plaintiff's personal property.

249.    The aforesaid dominion and control was in denial of, and, or inconsistent with PLAINTIFF's title and rights over PLAINTIFF's personal property which was contained in his desk in the Metro Detective Robbery Section Offices and in derogation, exclusion, and defiance of such title or rights.

**SEVENTEENTH CAUSE OF ACTION**
**(CONCERT OF ACTION)**
**(Against all individual defendants)**

250.    Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

251.    Defendants  Sgt. James Melton, Lt. Clinton Nichols, Captain Patrick Neville, Deputy Chief James Owens, Lt. Ray Steiber, Director Walter Norris, Assistant Sheriff Theodore Moody, Undersheriff James Dixon, Dr. Keith Bowman, Director Judy Bleak, Director Michael Synder and Director Jeffery Roch , and their subordinates, acted in concert with one another and pursuant to a common design when they unlawfully

trespassed against the chattels, and otherwise, stole property belonging to Plaintiff and converted it to their own use forever, and acted to retaliate against Plaintiff for exercising his free speech rights, for refusing to engage in illegal evidence and witness tampering in the Carter Case, refusal to engage in evidence tampering and it cover up in the Carter case, his investigation and findings regarding Metro Narcotics' Division involvement in the Alamo Murder Case, as well as his making ethics violations complaints against Defendant Gillespie, as well as his outspokenness in general including his opposition to the mishandling of evidence in the Suave Lopez shooting, and the shooting death of Metro Sergeant Henry Prendes, in ransacking Plaintiff's Desk, stealing his personal property, misappropriating Metro property, conspiring to retaliate against him after filing a workers compensation claim, summarily cutting off his Metro salary, deleting and misappropriating his accrued leave, and other benefits and tortiously discharging Plaintiff who is a 34 year veteran Metro Detective with an impeccable service record without any legal reason to do so.

252.    Defendants _ Sgt. James Melton, Lt. Clinton Nichols, Captain Patrick Neville, Deputy Chief James Owens, Lt. Ray Steiber, Director Walter Norris, Asst Sheriff Theodore Moody, Undersheriff James Dixon, Dr. Keith Bowman, Director Judy Bleak, Director Michael Synder and Director Jeffery Roch , and their subordinates acted in Concert with one another and pursuant to a common design when the acted upon their conspiracy to falsify the police report, in the Carter Case wherein Detective Terri Miller knowingly wrote false information about the chain of custody regarding evidence in the Carter Case and Lt. Melton, Lt. Nichols, Captain Neville and other command staff level officers unlawfully agreed, and in fact did unlawfully support the false allegations contained therein.

**EIGHTEENTH CAUSE OF ACTION**
**(RESPONDEAT SUPERIOUR)**
**(Against the GILLESPIE, METRO Defendants)**

253.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each

paragraph set forth above by this reference as though the same is fully set forth herein.

254.     Defendants Sgt. James Melton, Lt. Clinton Nichols, Captain Patrick Neville,

Deputy Chief James Owens, Lt. Ray Steiber, Director Walter Norris, Asst Sheriff

Theodore Moody, Undersheriff James Dixon, Dr. Keith Bowman, Director Michael

Synder and Director Jeffery Roch  and other members of Sheriff Gillespie's Command

Staff were under the control of GILLESPIE and METRO and all the acts complained of

herein were within the scope of their employment.

**NINETEENTH CAUSE OF ACTION OR CLAIM FOR RELIEF**
**Injunctive and Declaratory Relief**

255.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each

paragraph set forth above by this reference as though the same is fully set forth herein.

256.     Defendant's continued violations of the State and Federal Constitutions require

equitable relief to prevent further harm.

257.     Plaintiff and re-alleges each paragraph set forth above by this reference as though

the same is fully set forth herein.

258.     Plaintiff further requests that this Court declare Defendant's conduct as being

violative of the laws and statutes set forth in this Complaint and to declare Defendant's

conduct a violation of state and federal law.

## **TWENTIETH CAUSE OF ACTION**

### **Retaliation in violation of 42 USC §1981**

232.   Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

233.   Plaintiff engaged in protected activity and specifically complained that certain supervisory personnel were treating him differently in workplace based on his minority status and age.

234.   On October 25, 2012, Plaintiff received a 'Right To Sue Letter' from the EEOC.

235.   After Plaintiff filed a complaint for racial discrimination on or about August 14, 2012, Plaintiff  to adverse treatment.  On August 16, 2012 a pre termination letter from Metro scheduling the date for an employment termination hearing.  Plaintiff's pay from Metro had already been cut off on July 16, 2012, without notice to Plaintiff.  On August the 15, 2012, Plaintiff's medical insurance was cut off.   The adverse treatment which Plaintiff was subjected to was a result of his engaging in a protected activity including but not limited to objecting to and refusing to engage in the mishandling of evidence and its cover-up in the Carter Case, continuing to investigate the Alamo Murder Case, objecting to the cover up and falsification of evidence in the Suave Lopez and Henry Prendes case and for the filing of a Civil Rights Racial Discrimination lawsuit against Metro on August 14, 2012.

236.   As a result of Defendant's actions and inactions, Plaintiff has been damaged in an amount in excess of $3,000,000.00.

237.   The conduct of Defendant and its employees have been malicious, fraudulent and oppressive and was designed to vex, injure, annoy or harass Plaintiff and thus  Plaintiff is entitled to punitive damages under §1981 in an amount in excess of $3,000,000.00.

238.   As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to his attorneys' fees and costs of suit as provided by §1981.

## **TWENTYFIRST CAUSE OF ACTION**

### **(Tortious Discharge)**

**(Employment Termination based on Plaintiff's filing of a Racial Discrimination Lawsuit)**

232.   Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

233.   That Plaintiff Gordon Martines was employed by Metro for approximately 34 years, the last 25 of which Plaintiff was employed as a Metro Detective;

234.   That Metro demoted, re-assigned, harassed, threatened and discharged Plaintiff.

235.    That Plaintiff's filing a civil rights lawsuit for Racial Discrimination against Metro on August 14, 2012.  Plaintiff's filing of this lawsuit was the motivating reason for Metro's discharge of Plaintiff.

236.   The tortious discharge has caused Plaintiff harm.

237. Defendant Metro's decision to discharge, terminate and misappropriate Plaintiff's accrued leave was motivated by plaintiff's filing of a lawsuit for Racial Discrimination on August 15, 2012.

## **CLAIM FOR ACTUAL DAMAGES**

259.      Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

260.      As a result of defendants' conduct, as alleged in the paragraphs above Plaintiff has suffered lost wages and benefits of employment, and damage to his professional

reputation in an amount found appropriate by a jury at trial, and is estimated to equal or exceed the amount of $3,000,000.00.

## CLAIM FOR PUNITIVE DAMAGES

261.      Plaintiff repeats and re-alleges and incorporates here in this cause of action each paragraph set forth above by this reference as though the same is fully set forth herein.

262.      Defendants acted in conscious disregard of the knowledge of the probable harmful consequences of their malicious, reckless and wrongful acts and a willful and deliberate failure to act to avoid those consequences.

263.      Defendants acted fraudulently using intentional misrepresentations, deceptions and - or concealment of material facts known to the Defendants with the intent to deprive Plaintiff of his rights and property and to injure Plaintiff.

264.      Defendants acted maliciously both expressed and implied in that Defendants' conduct was intended to injure Plaintiff, such was and is despicable and was and is engaged in with a conscious disregard of the rights of Plaintiff.

265.      Defendants acted against Plaintiff with oppressive and despicable conduct that subjected Plaintiff to cruel and unjust hardship with conscious disregard of the rights of the Plaintiff.

266.      Punitive damages are available in this case under 42 USC § 1983.

267.      The Defendants' conduct was malicious, reckless and showed a reckless and callous indifference to the Plaintiff's federally protected rights, and Nevada State rights and was and is motivated by evil motives and intent.

268.      An award of punitive damages against Defendants will serve the purpose of deterring of future egregious conduct by these Defendants. Smith v. Wade, 461 U.S. 30,

103 S.Ct. 1625, 75 L.Ed.2d 632 (1983);  Gertz v. Robert Welch, Inc., 418 U.S. 323, 94

S.Ct. 2997, 41 L.Ed.2d 789. Pp. 38-51.

### CLAIM FOR ATTORNEYS' FEES AND COSTS
#### (Pursuant to 42 U.S.C. § 1988)

269.     Plaintiff repeats and re-alleges and incorporates here in this cause of action each

paragraph set forth above by this reference as though the same is fully set forth herein.

270.     Under 42 U.S.C. § 1988 – "In any action or proceeding to enforce a provision of

sections1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-

318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.

2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42

U.S.C.2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.],

or section 13981 of this title, the court, in its discretion, may allow the prevailing party,

other than the United States, a reasonable attorney's fee as part of the costs."

271.     Attorneys for successful civil rights plaintiffs should recover a fully compensatory

fee.  Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933, 1940 (1983)). Although

section 1988(b) indicates that the award of attorney fees is discretionary, "the United

States Supreme Court requires an award of attorney fees to a prevailing party unless

special circumstances would render an award unjust." Newman v. Piggie Park Enters.,

390 U.S. 400, 402, 88 S. Ct. 964, 966 (1968)). Because congressional intent in

authorizing fee awards was to encourage compliance with, and enforcement of, civil

rights laws, courts must liberally construe section 1988(b) to achieve Congress's ends.

### DEMAND FOR JURY TRIAL

**Plaintiff demands a jury trial of this case pursuant to Local rule 38-1 and 28 USC
1411.**

//

//

**WHEREFORE**, Plaintiff prays for relief as follows:

1. For actual and general damages in an amount within this Court's jurisdiction and subject to proof at the time of trial;

2. For special damages in an amount within this Court's jurisdiction and subject to proof at the time of trial;

3. For compensatory damages;

4. For Statutory damages as allowed by law in excess of $3,000,000.00;

5. For punitive exemplary damages, where appropriate, in an amount sufficient to punish Defendant and to make an example out of them;

6. For attorney's fees and costs incurred by Plaintiff in this action;

7. For Equitable relief;

8. For Declaratory relief; and

9. For any other relief deemed just and proper by this Court.

DATED this 17th day of January, 2013.

Submitted by: David Otto & Affiliates, PC

/s/ David J. Otto

_____

By: David J. Otto

# VERIFICATION

I, Gordon Martines, under penalty of perjury declare as follows:

1. I am the Plaintiff in the Above Captioned Complaint and Case.
2. I have personal knowledge of all matters set out in the foregoing Complaint, and if called upon to testify I would competently testify as to the matters and allegations stated herein.
3. I verify under penalty of perjury under the laws the State of Nevada and of the United States of America that the factual statements in this Complaint concerning the actions of The Las Vegas Metropolitan Police Force, Sheriff Gillespie and all other individual defendants are true and correct to the best of my knowledge.

Executed on _JANUARY 18_, 2013.


Gordon Martines